following date of sale. The taxpayer made a practice of using the collections from customers who had paid their premiums before they were due to be paid by the taxpayer to the home office, to advance the premiums of the policyholders whose accounts had not been collected.

(12) In addition to the capital in the business and the funds of customers who had paid in advance, the corporation borrowed money with which to remit the premiums for various delinquent customers, the amount borrowed and unpaid as of December 31, 1920, being $10,000. This action was taken for the convenience of the company, its clients, and its bank, thereby obviating the necessity of accepting and discounting many notes receivable for deferred premiums.

DECISION.

The deficiency determined by the Commissioner is disallowed.

---

Appeal of THE GEO. B. RICABY CO.     Docket No. 582.

The taxpayer was not a personal service corporation within the meaning of section 200 of the Revenue Act of 1918.

Submitted January 12, 1925; decided January 31, 1925.

*Ray E. Zachman, Esq.*, for the taxpayer.

*J. A. Adams, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before GRAUPNER, LANSDON, LITTLETON, and SMITH.

This appeal is from an asserted deficiency in the amount of $9,000.96 for income and profits taxes for the years 1919 and 1920. The sole issue involved is whether the taxpayer is entitled to classification as a personal service corporation. From the testimony and documentary evidence introduced at the hearing, the Board makes the following

FINDINGS OF FACT.

1. The taxpayer is incorporated under the laws of the State of Ohio, with its principal place of business in the city of Toledo. It was organized September 30, 1918, with an authorized capital stock of $75,000 and has since been engaged in business as a general real-estate agent or broker. Its activities have been distributed among four departments, viz: (a) subdivision; (b) brokerage; (c) rental and management; and (d) loans. Eighty-four and one-half shares of capital stock were subscribed and paid for, issued, and owned, as follows:

| | | |
|---|---|---|
| George B. Ricaby_____ | 50 shares | $5,000 |
| S. W. Wood_____ | 25 shares | 2,500 |
| Arnold J. Machen_____ | 7½ shares | 750 |
| K. C. Rowland_____ | 1 share | 100 |
| Charles F. Chapman_____ | 1 share | 100 |
|     Total _____ | 84½ shares for | 8,450 |

The total of $8,450 represents all of the money invested by the incorporators in the business.

2. All of the stockholders named have devoted their entire time and attention to the business of the corporation, except Charles F. Chapman. He is an attorney at law and counsel for the corporation, devoting such time as may be required to perform the necessary legal services for the taxpayer. Ricaby, the president and treasurer of the corporation, had 14 years general experience in the real-estate business, while Wood, Machen, and Rowland were experienced in various branches of the business. These four men had been employed by an old established real-estate firm in Toledo, and left that employment to form the appellant corporation. Their activities in the business consisted of advising customers as to making investments in or selling real estate, appraising lands, planning and supervising the plotting, development, and marketing of subdivision tracts, purchasing and selling properties for customers, renting and managing improved property, placing loans, and caring for the details of operation of the offices and salesmen.

3. The services performed in each of the four departments or subdivisions of the corporation during the years 1919 and 1920 were as follows:

(a) *The subdivision department.*—At the solicitation of customers, the taxpayer selected lands suitable for subdivision purposes, arranged the terms of purchase, and acquired the properties for their customers, on their customer's account and credit, the taxpayer making no investment of its own funds. These duties, to be satisfactory to the customers and profitable to the taxpayer, required expert knowledge of municipal advancement, real-estate conditions, and public demand for classes of subdivision contemplated.

The process of dealing in subdivision properties was as follows: When a customer signified his desire to acquire land for sale on subdivision, a survey of desirable properties was made. This survey contemplated the cost of the property and its development, its desirableness and salableness, the terms on which it could be acquired, the likelihood of profit on sales of lots therein, and the probability of demand for lots therein. Such a survey was made by one of the stockholders, perhaps aided by an employee, but the conclusion as to what advice to give the client desiring to make such a purchase was reached by Ricaby and Machen, both stockholders. If the recommendation to the customer was favorable to the acquisition of a particular site, one of the stockholders would conclude the purchase and arrange for the financing of the project for the customer.

After purchase, the details of the development work would be considered by Ricaby with one or more of the stockholders. An engineering firm would then be called into consultation and directed to prepare plans in accordance with general directions given by Ricaby or Machen. When such plans were prepared, they were carefully inspected by Ricaby and Machen and alterations made in accordance with their suggestions. The engineers, while employed by the taxpayer as the customer's agent, were paid by the customer.

After the acceptance of the plans by the taxpayer and its customer, their approval by the city planning commission was obtained. The taxpayer, through its stockholders, then obtained bids and let contracts for such improvement and development work as had been decided upon, such as grading, paving, sewers, etc., the cost of which was charged to and paid by the owner. The development work was

supervised by Wood. After the improvements were completed, the property was ready to be marketed.

The sales period for subdivisions was a limited one—from April 1 to October 1. The taxpayer organized separate sales forces for the marketing of its subdivision tracts. As a matter of policy and expediency, it selected its sales personnel from persons who had no previous experience in selling real estate. This sales force was required to attend a training course, which was carried on at the taxpayer's office every morning for a period of one hour. Mr. Ricaby, assisted by one or two of the other stockholders, conducted the course of instruction, which was intended to give the salesmen a knowledge of the particular property, its value and desirability, the reasonableness of the prices asked when compared with prices of surrounding property, and the general real-estate condition in Toledo. The sales force thus employed and trained varied in numbers from 25 to 75 at one time, the number fluctuating according to season, opportunities for better employment, and quantity of property on sale. The turnover in this sales force was about 300 per cent each year. These salesmen were paid no salaries or advances, but received a commission, payable partly when a sale was closed and partly from installments, when received, from such sale. The commission varied from 3 to 5 per cent, dependent upon the class and value of the property sold. All sales negotiated by this sales force were required to be approved by one of the stockholders, and the actual closing of each sale was performed by a stockholder.

In event of financial difficulties arising over the carrying out of a subdivision project, Ricaby arranged and concluded all of the details of refinancing as agent for the customer. Refinancing was necessary in the cases of a majority of the subdivisions handled by the taxpayer and was an important factor in maintaining the business. The necessary funds were in no way contributed from the assets or resources of the taxpayer.

The contracts under which the taxpayer acted as agent for owners of subdivided tracts were similar in their essential provisions and the epitome of one will suffice to show the character of employment of the taxpayer in all cases. The contract employs the taxpayer, as agent, to sell the lots in the described tracts for the owner at prices stipulated in an attached schedule. The taxpayer is granted the exclusive sales right to such lots and engages "to use its best endeavors in the sale of the same, doing the necessary advertising and using a sufficient sales force at its own expense in marketing said property." The owner agrees to pay the taxpayer a commission, which varies in the different contracts before us from 10 to 20 per cent of the sales price, on all lots sold, this commission to cover all charges for the sale of said lots, such as selling, handling, managing and advertising expenses. The commission provided was intended, though not specified in the contract, to cover the preliminary services of the taxpayer in preparing the subdivision for marketing.

(b) *Brokerage department.*—This department bought and sold properties, other than subdivision tracts and lots, for customers of the taxpayer. It was operated on a commission basis and neither sold nor bought properties for the account of the taxpayer. It also made appraisements and valuations, for which fees were charged as allowed by the Code of Regulations of the Toledo Real Estate Board.

Properties for sale in this department were advertised to the public. This department maintained a staff of salesmen consisting of 7 or 8 men in 1919 and 12 or 15 in 1920. This staff did not change in personnel as frequently as did the subdivision department. The salesmen received no salaries but were paid one-half of the commission received by the taxpayer on sales or exchanges made by them. The rate or commission charged by the taxpayer was in accordance with the standard fixed by the Toledo Real Estate Board. Some sales or exchanges of property listed with the taxpayer were made through or by other real estate firms. In these cases commissions were shared with the selling firm, instead of with a salesman. All sales and exchanges were concluded by one of the stockholders and not by any of the salesmen. The taxpayer depended on its salesmen to sell the properties listed with it, provided them with names of prospective purchasers, furnished office facilities, and contributed a sum to each for purchase of gasoline to operate their own cars while engaged in company business.

(c) *Rental and management department.*—This department had in charge the rental and management of properties intrusted to the care of the taxpayer. Renting and leasing were done upon a commission basis in accordance with the schedule of rates fixed by the Toledo Real Estate Board. Properties for rental were advertised to the public. Collections of rents were made by the collection branch of the general office and the taxpayer received a commission for such service. This department was under the actual control and supervision of the stockholders.

(d) *Loan department.*—This department was created in 1920. It received applications for loans from persons desiring to borrow on the security of real estate. The taxpayer represented the Prudential Life Insurance Co. for the purpose of making loans. Upon receiving an application a survey was made of the property offered as security and an appraisement made thereon, a report was then made up, an abstract of title obtained, and all of these were forwarded to the Prudential Life Insurance Co. If the loan was approved, the insurance company forwarded the money to the taxpayer and the loan was concluded with the applicant. For this service a fee was charged the borrower. This department was under the immediate charge of Rowland, though some of the incident services were performed by employees.

4. The taxpayer maintained one branch office in 1919 and three in 1920. These offices were under supervision of branch managers, who were not stockholders. These branch managers received no salary but were compensated by receiving a portion of the commission earned on all sales passing through the branches. There was also a sales manager who was not a stockholder, but received no salary and shared in commissions. The branch managers and the sales manager had no authority to close sales or to hire or discharge salesmen. These functions were performed by the stockholders. Ricaby and Machen participated actively in controlling and supervising the transactions of the brokerage department and gave much of their personal attention to its activities.

5. The activities of the four departments described above are interwoven with those of the main office. The main office carried the accounts, performed the accounting services, made the collections,

and disbursed the expenses, commissions, and salaries for all the departments. The staff of this office was composed of about 12 persons in 1919 and about 17 in 1920, and consisted of cashier, book-keepers, secretaries, stenographers, rent collectors, and clerical help. This staff was paid on a salary basis. The office activities were under the immediate direction and supervision of Mr. Rowland, though the other stockholders participated in direction as the matters under their immediate attention required.

6. The balance sheets showing the assets and liabilities of the taxpayer on December 31, 1919, and December 31, 1920, were as follows:

### AS AT DECEMBER 31, 1919.

#### ASSETS.

| | | | |
|---|---|---:|---:|
| Current assets: | | | |
| Cash on hand and in banks | | | $2,544.37 |
| Revenue stamps | | | 94.65 |
| Notes receivable | | | 217.63 |
| Accounts receivable— | | | |
| Brokerage accounts | Schedule 1__ | $11,782.73 | |
| Rent accounts | Schedule 2__ | 5,576.21 | |
| Subdivision accounts | Schedule 3__ | 8,109.55 | |
| Salesmen's accounts | | 983.63 | |
| Sundry debtors | Schedule 4__ | 22,592.33 | |
| | | | 49,044.45 |
| Total current assets | | | 52,001.10 |
| Deferred assets: | | | |
| Unrealized commissions receivable from subdivisions (gross) | | | 34,759.08 |
| Fixed assets: | | | |
| Office furniture and fixtures | | $2,012.19 | |
| Less reserve for depreciation | | 101.62 | |
| | | | 1,910.57 |
| Total assets | | | 88,670.75 |

#### LIABILITIES.

| | | | |
|---|---|---:|---:|
| Current liabilities: | | | |
| Bank overdraft—The Ohio Savings Bank & Trust Co | | | 5,412.78 |
| Accounts payable— | | | |
| Brokerage accounts | Schedule 6__ | $9,748.39 | |
| Rent accounts | Schedule 7__ | 2,095.98 | |
| Subdivision accounts | Schedule 8__ | 9,519.47 | |
| Salesmen's accounts—Current commissions | | 3,947.53 | |
| Purchase creditors | Schedule 9__ | 1,113.09 | |
| Sundry creditors | Schedule 10__ | 5,681.09 | |
| | | | 32,105.55 |
| Total current liabilities | | | 37,518.33 |
| Deferred liabilities: | | | |
| Commissions payable to salesmen upon realization of commissions from subdivisions | | | 9,041.31 |
| Deferred income: | | | |
| Contingent upon realization of commissions from subdivisions | | | 25,717.77 |

#### CAPITAL.

| | | | |
|---|---|---:|---:|
| Capital stock—authorized | | $75,000.00 | |
| Less capital stock—unissued | | 66,550.00 | |
| | | | 8,450.00 |
| Subscriptions to capital stock | | 8,250.00 | |
| Less unpaid subscriptions | | 8,250.00 | |
| Surplus | | | 7,943.34 |
| Total liabilities and net worth | | | 88,670.75 |

### AS AT DECEMBER 31, 1920.

#### ASSETS.

Current assets:

| | | |
|---|---:|---:|
| Cash on hand and in banks | | $9,620.62 |
| Liberty bonds | | 12,200.00 |
| Revenue stamps | | 180.64 |
| Accounts receivable— | | |
|    Brokerage accounts—Schedule 1 | $808.60 | |
|    Rent accounts—Schedule 2 | 11,633.57 | |
|    Subdivision accounts—Schedule 3 | 14,538.75 | |
|    Loan accounts | 145.65 | |
|    Salesmen's accounts | 8,201.18 | |
|    Sundry debtors—Schedule 4 | 34,795.18 | |
| | | 70,122.93 |
| Total current assets | | 92,124.19 |
| Deferred assets: | | |
| Unrealized commissions receivable from subdivisions (gross) | | 139,760.70 |
| Fixed assets: | | |
| Office furniture and fixtures | $9,438.48 | |
| Less reserve for depreciation | 821.69 | |
| | | 8,616.79 |
| Total assets | | 240,501.68 |

#### LIABILITIES.

Current liabilities:

| | | |
|---|---:|---:|
| Notes payable—Schedule 5 | | $10,800.00 |
| Accounts payable— | | |
|    Brokerage accounts—Schedule 6 | $10,852.70 | |
|    Rent accounts—Schedule 7 | 11,012.54 | |
|    Subdivision accounts—Schedule 8 | 7,890.55 | |
|    Loan accounts | 838.77 | |
|    Salesmen's accounts—Current commissions | 14,703.64 | |
|    Purchase creditors—Schedule 9 | 5,207.56 | |
|    Sundry creditors—Schedule 10 | 238.05 | |
| | | 50,743.81 |
| Total current liabilities | | 61,543.81 |
| Deferred liabilities: | | |
| Commissions payable to salesmen upon realization of commissions from subdivisions | | 24,246.51 |
| Deferred income: | | |
| Contingent upon realization of commissions from subdivisions | | 115,514.19 |

#### CAPITAL.

| | | |
|---|---:|---:|
| Capital stock—Authorized | $75,000.00 | |
| Less capital stock—unissued | 66,550.00 | |
| | | $8,450.00 |
| Subscriptions to capital stock | 8,250.00 | |
| Less unpaid subscriptions | 8,250.00 | |
| Surplus | | 30,747.17 |
| Total liabilities and net worth | | 240,501.68 |

7. The income of the taxpayer and the deductions taken for the years 1919 and 1920 were as follows:

| INCOME. | 1919. | 1920. |
|---|---:|---:|
| Brokerage (purchases and sales) | $28,406.05 | $41,379.94 |
| Rent | 6,426.04 | 16,293.46 |
| Subdivision (sales) | 37,296.66 | 139,642.71 |
| Loans | | 612.85 |
| Total | 72,128.75 | 197,928.96 |

| DEDUCTIONS. | 1919. | 1920. |
|---|---|---|
| Salary, officers | $8,900.00 | $19,050.00 |
| Salary, office employees | 6,385.37 | 14,325.07 |
| *Commission to salesmen* | *21,830.31* | *78,016.50* |
| *Advertising* | *13,147.49* | *30,502.10* |
| Stationery, printing, etc | 1,300.75 | 3,699.23 |
| Telephone, postage, etc | 472.55 | 1,773.72 |
| *Auto expense* | *4,020.54* | *10,298.93* |
| Rent, janitor, and supplies | 1,424.66 | 5,413.34 |
| Bad debts | 31.04 | 53.50 |
| Depreciation | 101.62 | 720.07 |
| Entertaining and traveling | 872.24 | 3,701.61 |
| Miscellaneous and other expenses | 1,146.66 | 7,370.19 |
| Total | 59,633.03 | 174,924.26 |
| Total income | 72,128.75 | 197,928.96 |
| Total deductions | 59,633.03 | 174,924.26 |
| Net taxable income | 12,495.72 | 23,004.70 |

8. As shown by the balance sheet set forth above, money was borrowed from banks in 1920, in the amount of $10,800 to carry Liberty bonds subscribed for by the taxpayer. This is reflected in the liabilities under heading of notes payable. Sums of considerable size and comparatively large proportions were advanced to the stockholders, amounting to $22,411.46 as of December 31, 1919, and $34,041.76 as of December 31, 1920. These amounts are included in the balance sheets under the subheading of " Sundry debtors " as a part of " Current assets." Advances were made to salesmen, in a few instances, in anticipation of commissions earned. In some instances advances were made for clients, but in small amounts and for short terms. The taxpayer always had in its possession large sums of money belonging to clients and awaiting payment on taxes, purchases, etc., or distribution to the customers. This was an unavoidable incident to the business.

9. The taxpayer did not trade as a principal during the years involved, but acted solely as agent or broker for its customers. It engaged in no contracts with the Government, nor did it indirectly receive any income from any Government contracts.

10. The Commissioner has denied the taxpayer a classification as a personal-service corporation and determined a deficiency in income and profits taxes against it in the amount of $2,758.80 for the year 1919 and $6,242.16 for the year 1920.

### DECISION.

The determination of the Commissioner is approved.

---

### Appeal of CITIZENS LOAN ASSOCIATION. Docket No. 412.

Under the facts disclosed by this appeal the income of the taxpayer was that of a corporation in the calendar years 1918 and 1919 and properly taxable as such; for the year 1920 the income of the taxpayer was that of a copartnership and should be apportioned among the partners according to their interests and taxed accordingly.